P.EPOBT OE MajOBITY OE COMMITTEE.
Assembly Chambee, April 6th, 1865.
Mr. Angel and Mr. Edwards, from the committee on privileges and elections, to which was referred the petition of Joseph Shook, that he may be awarded the seat now occupied by Hon. O. M. Hungerford, reported, in writing.
Mr. Gleason, from the same qommittee reported, in writing, arriving at the same conclusions.
Eepobt oe the Majoetty oe the Committee on Peivileges and Elections, on the Contested Seat in the Second Assembly Dis-tbict oe Albany County.

Report of Messrs. Angel and Edwards.

The undersigned members of the committee on privileges and elections, respectfully report':
That we have heard the proofs and allegations of the parties in relation .to the contested seat occupied by the Hon. Oliver M. Hungerford, a member of this House, • representing the second Assembly district of Albany county, and whose seat is claimed by *336 Joseph Shook, and herewith submit the following facts and conclusions.
By the certificate of the county canvassers, it is shown that Oliver M. Hungerford received two thousand seven hundred and sixty-one votes, and Joseph Shook received two thousand seven hundred and thirty-two votes, thus electing Mr. Hungerford by twenty-nine votes.
The claim of Mr. Shook to the seat occupied by Mr. Hungerford, is based upon two grounds.
First. Illegal votes that were given for the sitting member; irregularities in the canvass of- the votes by which he was deprived of votes that were cast for him, and the rejection of soldiers’ ballots that should be counted and allowed in his favor.
Second. That at the poll of the western district of the ninth ward in the city of Albany, the republican, or union electors of the district, were, many of them, prevented from voting by a combination of lawless men, who obstructed the polls, assaulted and beat persons attempting to vote, and drove away from the place of voting, by threats and violence, a number more than sufficient to have changed the result and elected the contestant.
In relation to the first point stated, we find from the evidence the following facts:
By the return of the inspectors of tide western district of the ninth ward of the city of Albany, it appears that Mr. Hungerford received in that district four hundred and thirty-five votes, and Mr. Shook received one hundred and forty-nine.
The ballots used by the two opposing parties were printed on paper of different colors, the democratic tickets being printed on yellow paper, and the union tickets on white.
In canvassing the votes the inspectors found over forty tickets of the yellow paper with the names of the union candidates pasted on over the names of the democratic candidates inside the ballot. On two of the Assembly tickets of this kind, the name of Mr. Shook had become loosened after being pasted, but were found inside the ballot' when the same was opened. These ballots, evidently intended for Shook, were allowed to and counted for Hun-gerford, and form a part of his aggregate vote. (See evidence of Stremple, page — .)
These two votes, deducted from Hungerford’s aggregate vote, reduce the number to two thousand seven hundred and fifty-nine, *337 and added to Shook’s, increase his to two thousand seven hundred and thirty-four.
The vote of Willis Yan Wagoner was received at the poll of the eastern district of this ward, and counted for Mr. Iiungerford. The evidence shows conclusively that he was not a resident of the district nor of the county, but- was then residing, in' the. county of Schoharie. (See printed testimony, pages-and-.) This vote, deducted, leaves the aggregate of Hungerford’s vote two thousand seven hundred and fifty-eight.
The vote of John Titus was also given at this poll for Hunger-ford under similar circumstances, he being at the time a resident of another district. (See testimony, page-.) Deducting this vote leaves the aggregate of Hungerford’s vote at two thousand seven hundred and fifty-seven.
The vote of Charles Lewis, a soldier, was cast .at the poll of. the lower district of the ninth ward by Mayor Perry. This vote is objected to by the contestant on the ground that Lewis was not a resident of the ward when he enlisted. From the evidence of the mayor this fact seems apparent; but as there is no proof of the person for whom he voted, no deduction of the vote can be safely made.
Thomas B. Laraway voted for Mr. Iiungerford in the western district of the tenth ward, giving his residence at the alms-house in that district. The clerk of -the alms-house, called as a witness, testifies that no such man as Thomas B. Laraway resides at the alms-house, or was ever there as a pauper or otherwise, or is known there. This man was registered as at the alms-house, and having given a false answer as to his place of residence, the presumption arises that he was not a voter, and the vote is fraudulent and should be cast out. (S ... Dstimony, pages 283 and 321.) Deducting this vote, leaves H- - .rford’s aggregate two thousand seven hundred and fifty-six.
In the ern district of the tenth ward seventeen paupers from the COP'-- alms-house were brought to the polls and voted the democratic i net, and for Mr. Hungerford. It is admitted by the stipulation the parties that but five of these voters were sent to the a1 • house from the tenth ward, or were residents of that ward when u there, and that the remainder came from other towns and wards. . course, these last named voters had acquired no residence in the enth ward, by virtue of being kept at the alms-house at public *338 expense, and they were not legal voters in the tenth ward. Twelve of these votes are already illegal, and being deducted from Iinnger-ford’s vote, leaves it at two thousand seven hundred and forty-four.
On comparing the ballots given ' and received at the poll of the western district of the ninth ward, six or seven democratic votes were found with a pencil mark drawn across the name of Mr. Ilun-gerford and the name of Mr. Shook written in. These ballots were not allowed to either party, for the alleged reason that the name of Mr. Hungerford was not entirely obliterated, and could be read. There can he no question hut that these votes were intended and actually cast for Mr. Shook, and should have been allowed and canvassed to him. Adding six of these votes to the vote of Mr. Shook, and the two pasted tickets heretofore referred to, and deduct from Iiungerford’s vote, increase the vote of Mr. Shook to two thousand seven hundred and forty.
James Parrot, an elector of the western district of the ninth ward, held and offered to the inspectors ten soldiers’ votes that had been directed and delivered to him. Two of the votes were opened by the inspectors and deposited in the box. The other eight votes were refused by the inspectors, for the alleged reason that they were not registered, and Parrot was directed to procure the necessary affidavits. This was done by him, and on returning to the polls he attempted again to deposit these ballots. In this attempt he was defeated by persons who blocked the polls and drove him away, and kept him from reaching the place of voting by force and violence. The witness produced the ballots and envelopes, with the proper power of attorney inclosed, before the committee, and each envelope contained a vote for Mr. Shook. It was proven to the entire satisfaction of the undersigned that these soldiers were all legal voters in the western district of the ninth ward, and were not in the State on the day of election.
These facts present a new question in the history of our election contests. We have no precedent for determining this question, inasmuch as no state of circumstances has ever before existed, under which the question could possibly arise. Ordinarily, votes not deposited in the ballot-box, are not counted for the party claiming them, on the ground of .the uncertainty of the evidence as to the actual intentions of the voter, and what might have been the result had his vote been actually cast. In the case of Low and Uiven in the Senate, Judge Folger, in his reports remarks, in relation to those who have offered *339 and. been prevented from voting, “ the power of changing their vote remains with them nntil it has passed into the box, and we cannot assume that such power would not, in some cases, be exercised.” (Senator Folger’s report, page 37.)
This reason, which is conceded to be sound in relation to a vote offered by the elector in person, could not apply to the case of a soldier’s vote, under the law of this State, in conformity with which it is offered. Although not deposited in the box, it had left the hands of the elector, beyond his recall or power to change or alter it. He had done all that he was required to do, or could do, to exercise his rights, and there is no chance for mistake, nor any doubt as to the party for whom he intended to vote. The ballots, with the power of attorney that accompanied them, were preserved and presented to the committee, and in our hands are now in the custody and under the control of the House.
Somewhat analogous to the principle we would apply to these votes, is the practice of the British Parliament, cited by Senator Folger, in his report, above referred to, wherein he says, “ the parliamentary committees exercise the power of adding to the poll legal- vote^ which have been tendered and rejected. This, however, is under a system of viva voce voting. The voter approaches the polling-booth, and the very tender of his vote is an announcement of how he votes.” And in many, if not inmost or all cases, the name of the voter is recorded upon the poll-books by the receiving officer, with the name of the person for whom he votes; and in some way, by some mark or designation, it is manifested that his vote is not to be counted in arriving at the result, until the question is settled of his right to vote. But there stands upon the record all that is needed to make a perfect vote as soon as that question is put at rest, the name of the voter and that of the candidate of his expressed choice. There needs no further act on the part of the voter or receiver of votes to make clear the will and intent of the voter. This must be the reason of the power exercised in England to add to the poll “ tendered votes.” And in one case it would seem, that the tendered and rejected vote was not added to the poll, though ascertained to be legal, because the voter “ did not declare his preference ; he ought to have declared for whom he voted.” ^Leominster ease, 1,796, 2 Peekwell, 168.”)
Thus it seems to be settled, that in cases of voting by ballot, and by a viva voce vote, different rules are applied and different results *340 prevail; and yet, in both eases, the rule has reference solely to the will and intention of the voter. In the case of voting by ballot, the vote is not counted, for the reason that the voter has in no satisfactory way declared his final intention, and the possibility of a change in his determination before his vote reaches the ballot-box, and is still under his control. In the case of viva voce voting, the vote is allowed, because the intention of the voter is declared,.and his vote placed beyond the power of being changed or recalled.
In the case we are considering, the soldier is in the position of the voter who declares his preference viva voce, so far as the rules governing his case are concerned. He has declared his preference ih writing, which admits of no possibility of mistake, — has given his friend a power of" attorney to cast his vote, and has placed the ballot beyond his power of recall, or change of intention. The same reason, therefore, that allows “tendered votes,” when given viva voce to be added to the poll, applies with far greater force to the soldier’s ballot, under our statute on that subject. We are clearly of the opinion that those eight votes should be allowed to and counted for Mr. Shook, which would increase his aggregate to two thousand seven hundred and forty-eight.
Joseph Artels, an elector, residing in the middle district of the tenth ward, voted for Mr. Shook in the western district of that ward, for the .reason, as he alleged, that he was registered in the western district and not in the other. Although a legal voter at the place of his residence, it is conceded that he did not reside in the western district, and under the requirements of the Constitution, his vote in that district was illegal, and should be deducted. This leaves the aggregate vote of Mr. Shook at two thousand seven hundred and forty-seven.
Objection was made by the sitting member to the vote of Stephen W. Thatcher, cast in the town of Knox. .It is contended that Thatcher was not of the age of twenty-one years, and not a legal voter.' From the declarations of Thatcher, this ivould seem to be the case, but it is not proven to the satisfaction of the undersigned for whom he voted. He voted a yellow ticket, but the proof that it was one that had been pasted, and was for Shook instead of Hungerford, comes short of establishing that fact; and as he was not called to state how it was, the matter is too uncertain to disturb the return in that respect.
Ero m the foregoing facts and conclusions the following result is deduced:
*341 Number of votes cast and that should be allowed to Joseph Shook.■ 2)747
To O. M. Hongerford. 2)744
Majority for Shook. 3
•Joseph Shook is, therefore, entitled to his seat by having received the greatest number of legal votes cast at the election in November last.
Second. But another and important question is raised under the second head of the case, made by the contestant. On this point the proof is clear and overwhelming. It appears that from the opening of the polls in the morning, an organized band of lawless men combined to obstruct the polls, and to prevent union voters or those having white tickets from approaching the place of voting. On every attempt to approach the polls, if they were discovered to have white tickets, they were crowded back and driven away by force and violence, and many of them were assaulted and beaten in a cruel and outrageous manner. Some were seized by the neck, their ballots taken from them and destroyed, and the voter driven from the polls. The -leaders of these disturbers of the peace were acting under the direct authority of the inspectors of election, under pretense of an appointment as special constables, and in the presence of the mayor; and some members of the police force under his command, claimed authority superior to theirs, and threatened them with violence if they attempted to interfere. It was openly proclaimed by these men that no union votes should be polled on that occasion at that place, while every facility was afforded to those voting the yellow or democratic ticket. It does not appear that a single democratic elector who desired to vote failed of an opportunity to do so. On the other hand, forty-seven persons were called as witnesses, who testified that they went to the place of election to vote, prepared with tickets, and desiring and intending to vote the union ticket and for Mr. Shook. All of these witnesses testified that they were kept away from «the polls and prevented from voting by violence and threats. .Aside from the danger attending the effort to vote, they found it physically impossible to reach the polls. A crowd of excited and boisterous men, acting in concert, shut up the approaches to the ballot-box, and whenever and as often as union voters came near the place where the votes were received, a rush was made by the crowd and the whole mass carried away, and often *342 into the street. The place of voting was in a room in the rear of a corner grocery, separated only by a partition through which a door communicated with the common drinking room, where liquor was freely sold and drank during the day, and the votes were taken through a window on the sidewalk. This gave ample room and opportunity for the exercise of the brutal instincts of the leaders of this outrage, and the evidence presents a sickening detail of a transaction that reflects deep disgrace on those who were engaged in the performance, and on the public authorities by whom it was permitted, and especially on those by whom it has been suffered to go so long unpunished.
It is also already evident from the evidence that, in all, more than one hundred persons were prevented from voting at this poll, by the means described, and that a sufficient number were thus deterred from exercising their right of suffrage to have changed the result, even had the majority of Mr. Ilungerford been many times the number declared by the board of county canvassers.
It is not claimed that these votes can be counted for Mr. Shook; but it is insisted that the scenes of disorder and violence which prevailed at the poll of the western district of the ninth ward, was of such a character as to render the election in that district void, and require that the entire vote be thrown out.
In this opinion the undersigned fully concur. The evidence shows one of the most disgraceful and ruffianly transaction ever indulged in on a similar occasion,' by any people claiming to be civilized, or possessing any regard for law and good order. That such á transaction could have taken place within the limits of a city like this, and in the presence of the mayor of the city, with an ample police force under his control, is not only amazing, but highly calculated to produce alarming suspicions of complicity in the public authorities in an event so much to be deplored. . The whole transaction deserves to be rebuked in a manner that shall be a warning to all who may be disposed to indulge in like proceedings. These lawless men should be taught the lesson, that when they attempt to control elections by such means, there is a power than can and will correct the evil they would do, and that they cannot profit by any success achieved under such circumstances.
It is fortunate that the legal proposition involved in this branch of the case has been adjudicated and settled. An examination of the following authorities is conclusive as to the power and duty of this *343 body to pronounce the election in the western district of the ninth ward in the city of Albany void, on the ground that the election was interfered with by force, and was not free. Law and Practice of Legislative Assemblies, p. 67; Report of Contested Elections by Cushing, p. 148.
If this view of the ease be correct, there can be no question as to the right of the contestant, Joseph Shook, to the seat now occupied by Mr. Hungerford, and the duty of this House to secure to him that right, and to vindicate, at the same time, the right of every citizen to the safe, convenient an peaceable exercise of his duty as an elector.
The undersigned feel gratified in being able to state, that the proofs in the case in no manner implicate the sitting member in any of the disgraceful transactions that resulted in securing his election. It is his misfortune to have been supported by such friends; but he will carry with him, in his retirement from this body, not only our respect, but our sympathy for the unfortunate situation in which he is placed.
The undersigned recommend the adoption of the following resolutions :
Resolved, That the election held in the ■ western district of the ninth ward of the city of Albany, on the 8th day of November last, is hereby declared void, in conséquence of the freedom thereof being interfered with by violence to such an extent as to disfranchise a large proportion of the electors residing in said district.
Resol/oed, That Jacob Shook by the greatest number of legal votes cast, was duly elected a member of the Assembly from the second district of Albany county, on the 8th day of November last, and is entitled to the seat now occupied by the Hon. Oliver M. Hungerford.
All of which is respectfully submitted.
W. P. ANGEL.
E. EDWARDS.
Repost oe Me. Gleason.

To the Assembly of the State of Neto York:

The undersigned, from the committee on privileges and elections of this body, to which was referred the petition of Joseph Shook, of the town of Guilderland, county of Albany, praying for the reasons therein set forth, that he might be declared elected and entitled to a seat in this body from the second Assembly district of the county of Albany, in the place of Oliver M. Hungerford, now occupying said seat, respectfully reports:
*344 The evidence adduced upon this investigation by the contestant and the sitting member, may be considered under two general heads :
First. Evidence relating to illegal or improper votes cast, and to irregularities or informalities in the canvass and return thereof.
Second. Evidence relating to the alleged riot or tumult at the polls in the western election district of the ninth ward in the city of Albany, on the day of election, which, the contestant claims, rendered the election in that district void.
It was shown from the statement of the county canvass in the county clerk’s office that Mr. ITungerford had received two thousand seven hundred and sixty-one votes, and Mr. Shook two thousand seven hundred and thirty-two, giving Mr. ITungerford a majority of twenty-nine. (Page 2.)
The return of the western election district of the ninth ward in the city of Albany, showed that four hundred and thirty-five votes had there been cast for Mr. ITungerford, and one hundred and forty-nine for Mr. Shook. (Page 1.)
The votes which were improperly received or rejected, will be first considered.
PaupeR Totes.
Thirty-three persons voted from the alms-house of Albany county at the western election district of the tenth ward. (Page 141.)
The Constitution of this State (Art. 2, sec. 3) declares that “For the purpose of voting, no person shall be deemed to have gained or lost a residence * * * while kept at any alms-house or other asylum, at public expíense.” /
The Revised Statutes (Part 1, chap. 6, title 4, art. 2, sec. 21) state that “No person shall be deemed to have lost or acquired a residence * * * by living in any poor-house, alms-house, hospital or asylum in which he shall be maintained at the public expense.”
A stipulation was made between the contestant and the sitting member, to the effect that all the paupers but five, who voted in this district, from the alms-house, had been sent to the alms-house from other towns and wards than the tenth ward, in which the alms-house is situated, and were residents of other towns and wards when so sent. (Page 222.)
Patrick W. Murphy, the clerk of the alms-house, testified that fifteen of these voters were paupers from the alms-house. (Pages 187-194.)
*345 Two of tbe voters from the alms-house, John Fitzgerald and Boger Kelley, are claimed as legal voters by the sitting member, on the, ground that the evidence was not sufficient to establish the fact of their being paupers.
The clerk, Mr. Murphy, swears that Fitzgerald was a nurse in the hospital, and had been so employed since last spring, but received no salary therefor. His wife, who was also a nurse, received a salary. Fitzgerald was on the books of the alms-house as a pauper. (Page 193.)
The same witness states that Kelley had charge of the stock since last spring, feeding the bull and chickens in the summer, and having also charge of the cows in the winter. He was paid no salary for his services, but had received money as a gratuity.
It is very clear that both these persons were paupers.
There is not a poor-house throughout the State where its inmates, who possess the proper physical qualifications, are not required to assist in the household or agricultural duties. To say that such persons, admitted as paupers, and kept as paupers, are voters in the district where the poor-house may be situated, would result in allowing to all the right of voting, save those only who were too infirm to engage in any kind of manual labor. Manifestly this is not the reason upon which the law is grounded. The language of the Constitution, as quoted above, is incapable of misconstruction, and the two persons under consideration, plainly fall within "the class of those “ kept in alms-house at public expense.” ■
Twelve of these voters are, therefore, to be considered paupers, and had consequently gained no residence in this ward. Their votes are to be rejected.
For whom did they vote ?
No positive testimony was offered on this point.
It appears from the evidence given by both parties, that the democratic tickets cast at this election, throughout the Assembly district, were yellow, and the union tickets whites (Pages 1-22-242.) Lagrange, one of the inspectors of the polls where the paupers voted, says that they voted the yellow ticket. (See page 173.)
This is further corroborated by the evidence of Cunningham (see page 196), Harrop (see page 200), Burt (see page 200), and others.
Grolden, the keeper of the alms-house, was a democrat, and electioneered at the polls for that ticket. (See page 186.) He gave permission to the paupers to go down and vote. (See page 194.)
*346 The undersigned is of the opinion that these facts are sufficient to warrant the conclusion that the paupers voted the democratic ticket. They were under the keeping of an active politician of that party, were by him allowed to go to the polls and vote, and cast ballots of the same color as the regular democratic tickets. Though scratched and pasted tickets were used, yet, there is no evidence to show that any such altered ballots were cast at this poll; and if there were, it would rest with the sitting member to show that these paupers cast such exceptional ballots, when the presumption was all the other way. (See report of Judge Folger, in the case of Low and Niven, page 48.)
Twelve votes are, therefore, to be deducted from the number given for Mr. Hungerford.
Pastees.
At the canvass of the votes taken at the western election district of the ninth ward, two Assembly tickets were found having Mr. Hun-gerford’s name upon them, but containing pasters with Shook’s name thereon. The only evidence relating to these tickets is given by Mr. Strempel, one of the inspectors. ■ (Page 88.)
He states that two of the Assembly tickets that had been pasted had come off, and were inside of the other tickets, and that these that were inside were the republican tickets; that Shook’s name had been pasted over that of Hungerford’s, and that the pasters were found loose in the paper where they had come off. These tickets were counted for Mr. Hungerford.
It is well settled by our courts, that the intention of the voter may be inferred from his acts. (People v. Saxton, 22 N. Y., 309; People v. Oook, 4 Seld., 67.)
Here there can be no mistake as to the intention. Manifestly, if these voters intended to cast their ballots for Mr. Hungerford, no pasters, with Mr.' Shook’s name thereon would have been found in them. The only reasonable explanation that can be given is that the votes were given for Mr. Shook, and that the pasters had become detached before the ballots were canvassed.
Two votes should consequently be deducted from the number returned for Mr. Hungerford, and added to that returned for Mr. Shook.
*347 Non-residents.
Several votes claimed to liave been cast for Mr. Hnngerford, were attacked on the ground that the parties giving them were not residents of the district where they voted.
Willis Van Wagner. It was shown that Mr. Yan Wagner, who was a single man, had boarded at Foland’s hotel in the eastern district of the ninth ward, for more than a year before election. On the 12th of October he visited Schoharie to attend a fair. He went into his uncle’s bank there, with the understanding that he was to succeed the cashier in case a vacancy, which was contemplated, occurred. He came to Albany on the 18th or 20th of October, sold out his desk, gave up his desk room at Weidman’s store, where he had been carrying on a commission business, paid his bill at Poland’s, and took his trunk with him to Schoharie. His old account books were left at the store, and some clothing at Foland’s. He directed his washing to be sent to Schoharie by express. On the 11th of November he concluded the arrangement with the bank at Scho-harie, and has remained there' ever since. (See pages 166-221-365.)
He voted the democratic ticket in the eastern district of the ninth ward. (See page 165.)
Yan Wagner himself says that he had no intention of remaining permanently in Schoharie until he effected the arrangement of November 11th. In coming to a conclusion as to his residence on election day, he seems to have been guided by what Cushing terms “the popular notion that a man, having once become a voter, must always afterward have a right to vote somewhere, and consequently, that he retains a right to vote in one place until he acquires it in another, which is wholly unfounded.” (See his testimony, page 365.)
Yan Wagner was not a resident of the district where he voted and his vote should be deducted.
Jolm Titus. It is shown that Mr. Titus, who was a single man, had been boarding at John Aley’s, in the western district of the ninth ward. He left from one to two weeks before election, saying that he was going to West Albany to work for a Mr. Fox, and desired his trunk to be sent there, which was done within a day ór two. He did not return to Aley’s again. His washing continued to be done in Lafayette street, in that district, until after election. Titus does not seem to claim that - he had a residence at Aley’s on election day, but says he intended to come back and board some *348 where in the district, and that he considered that district his home. (Pages 207-212.)
He voted for Mr. Hungerford in this district. (Page 209.)
This vote should be deducted. Titus had no residence in the district where he voted. His general intention of making that ward his home avails him nothing. He admits that he had given up his residence at Aley’s, and had not secured any other.
“ Inhabitancy and residence mean a fixed and permanent abode or dwelling place for the time being, as contradistinguished from a mere temporary locality of existence.” (8 Wend., 140.)
The vote of Charles Lewis, a soldier, cast by Mayor Perry, was attacked on the ground of his not being a resident of the eastern district of the ninth ward when the ballot was cast. (Page 259.)
There is no evidence to show how Lewis voted. (Page 268.) It is, therefore, not deducted from Mr. Hungerford’s vote.
Thomas B. Laraway voted at the western district of the tenth ward. His residence was entered on the poll-book by the clerk as being at the alms-house. (Page 168.)
The clerk of the alms-house says that no such person lived there. (Page 189.)
This was at best but a mistake or an irregularity on the part of the.poll-clerk. Certainly, it is no good reason for rejecting the vote of Mr. Laraway. (People v. Cook, 4 Seld., 67.)
This completes the list of votes given for Mr. Hungerford, attacked by the contestant.
We now come to the votes which should be allowed to or deducted from the number returned for Mr. Shook.
WRITTEN TICKETS.
On canvassing the votes cast in the western district of the ninth ward, several Assembly ballots were found, from which the name of Mr. Hungerford had been erased, and that of Mr. Shook inserted upon them in pencil. Strempel, one of the inspectors, says that 'eight such tickets were found, of which two only were allowed for Mr. Shook, and the remaining six were not credited to either party. Griffin, another of the inspectors, says that seven or eight such tickets were found, and one only allowed for Mr. Shook,' and that the remainder were not allowed to either.
Both agree that the name of Mr. Shook could be seen on all of them, and that the name of Mr. Hungerford had been erased. The *349 reason given for rejecting these ballots, entirely was, that Mr. Hun-gerford’s name had not been thoroughly erased, and the name of Mr. Shook had not been legibly written, though it was admitted that it could be made out. (Pages 13, 224.)
These ballots, to the number of six, should be counted for Mr. Shook. Even had the name of Mr. Hungerford not been erased at all, still the votes should have been counted for Mr. Shook.
The intention of the voter is clearly manifest here. When an instrument is partly printed and partly written, the printed part must yield to the written, part. (Harper v. Albany Ins. Oo., II N. Y., 198; People v. Saxton, 22 N. Y., -309.)
SOLDIERS’ YoTES.
James Parrot had ten soldiers’ votes to deposit in the western dis-. triet of the njnth ward. He voted himself and then handed up two of these soldiers’ votes, which were received and deposited. Hpon offering the third, the inspector refused to receive it, on the ground that the soldier was not registered, and directed Mr. Parrot to obtain the necessary affidavit, and also the outer envelope. It nowhere appears that Parrot offered the inspector any of the remaining seven votes. Parrot went away, got affidavits of residence for all of the soldiers, and also the outer envelopes, and returned to the polls, but was unable again to reach them by reason of the crowd and confusion. (See pages 26-28.) ■ Some of the soldiers, whose votes Parro.t did not cast, were registered. ■ (See register of that district.) All of them were shown to* be residents of the district and absent in the army. (See page 218.)
The eight soldiers’ votes are produced and found to be in all respects regular. Parrot swears that he opened them on the day after the election, and that each one contained a ballot for Mr. Shook. (See page 27.)
The undersigned is of the opinion that these votes were not properly presented to the inspector by Mr. Parrot. The inspector was right in refusing to receive a vote where the name of the party voting it was unregistered unless the affidavit required by'the law was furnished. He was not bound to know what other votes Mr. Parrot had, nor does it appear that any more of them were offered by him. Had he been tendered the votes of the four soldiers which were'registered, a different question would have arisén, which it is not necessary now to discuss. In this view" of the case, none of these votes can be *350 allowed to Mr. Shook, but they become important in another respect, as will be hereafter seen.
Several votes given for Mr. Shook were attacked by the sitting member, as follows:
Joseph, Artels. He resided in the middle election district of the tenth ward, and voted in the western election district of the same ward. (Page 386.) He voted for Mr. ¡Shook. (Page -386.) His vote should be deducted. The Constitution declares (article 2, section 1): “ Every male citizen, etc., shall be entitled to vote * * in the election district of which he shall at the time be a resident, and not elsewhere.”
Ep'liravm, Lassure. It is claimed that he was a non-resident of the eastern election district of the ninth ward, where he voted. He was a married man, and lived, in July last, with his family in this district. During that month he went to North Adams, in Massachusetts, to work. His family moved to some other part of the city, but where, it does not appear. They lived in the city on election day. Lassure continued at North Adams until election day, when he returned and voted. (See pages 313-311.)
It is alleged that he told Mr. Woolley on the morning of election that he had not come here to vote, that he kept house in North Adams, and had no vote here. (See page 317.) Another witness (Goodwin) says that he challenged Lassure’s vote at the polls; that Lassure said he had a right to vote, as his family lived here; that afterwards he confessed he was not entitled to vote, and went away, but returned and voted. (See page 379.)
This vote should not be deducted. The presumption is that Las-sure’s family still continued to reside in the district, and that he was a legal voter there. This presumption must be overthrown by the sitting member before the vote can be rejected. Lassure’s absence on business did not change his residence.. His statements are contradictory, and leave the question to be determined by the facts proved. (Williams v. Whiting; 11 Mass., 424 ; Jennison v. Hap-good, 10 Pich., 99 ; People v. Pease, 25 Howard, 511.)
He voted for Mr. Shook. (Page 382.)
Morgan L. Sehemerliorn. About two years ago Mr. Schemerhorn obtained a position as clerk at Washington. His family remained in Albany in the eastern election district of the ninth ward. During the spring of 1864 Mr. Schemerhorn’s wife died, when he broke up housekeeping and sold off the most of his furniture. The few arti *351 cles of furniture which he retained were stored partly at Charles W. Ford’s, who lived in the next house to the one formerly occupied by Mr. Schemerhorn, and partly at Dr. William L. Ford’s, the father of Charles W. Ford. «Dr. Ford lived in the middle election district of the ninth ward.
Mr. Schemerhorn also boarded his two children at Charles W. Ford’s, and stated when he thus broke up housekeeping that “ this should be ,his residence always; that though he clerked it at Washington, yet he should call this his home.”
Mr. Schemerhorn came on from Washington about a month before the election, and boarded with Dr. Ford. He voted in the middle election district of the ninth ward. (See pages 374-101.)
It is claimed that Mr. Schemerhorn Avas not a resident of Albany, or at least not a resident of the district in which he voted.
His vote should not be deducted. The evidence shows that Mr. Schemerhorn had never lost his residence in the ninth ward. This being admitted, the only remaining question to determine is whether he voted in the election district in which he at the time resided. Clearly, he resided at Dr. Ford’s, and was therefore a legal voter in that district. Though he may have held Charles W. Ford’s to have been his home till this last return before election, yet his conduct then showed his purpose of making Dr. Ford’s his home. (Crawford v. Wilson, 4 Barbor, 504 ; Fitchburgh ¶. Winchersdon, 4 Cush., 190.)
He voted for Mr. Shook. (Seepage380.)
Jacob Sterling. Mr. Sterling was a single man who had heretofore made his home at his mother’s, in the town of Knox, when out of employment. During the past summer and fall he worked for his uncle, who lived in the town of Cuilderland. He voted in' the town of Knox at the election. After election he was warned out by the overseer of the highways of Knox to work on the roads as a resident of that town. He then said that he would not because his home was in Cuilderland. (See pages 393, 394.)
This loose assertion by Sterling in order to avoid the payment of a tax is insufficient to counterbalance the facts shown. His mother’s house was evidently his home. There he spent his leisure time. In that town he voted. His neighbors considered it his home. (Lincoln v. Hapgood, 11 Mass. 350.)
He voted for Mr. Shook. (Page 387.) His vote cannot be deducted.
Stephen W. Thatcher: — He voted at the second election district in the town of Knox. While the board of registry for that district were *352 sitting lie told Mr. Wood that'he was not old enough to vote. (See pages 394, 395,)
Eor whom did he vote ?
Mr. 'Warrick prepared a set of democratic. tickets with union pasters for Thatcher. Tie thinks, hut is not sure, that Shook’s name was pasted over Iiungerford’s (See page 371.)
Mr. Whipple also had a set of pasted tickets prepared in the same way by Mr. Warrick. lie rode from Warrick’s store to the polls with Thatcher. (See page 397.)
Mr. Wilber, one of the inspectors, took Thatcher’s State and electoral tickets at the polls to deposit in the box. lie noticed at the time something unusual in them, that they were stiffer and harder than others. They were yellow in color. (See page 396.)
Mr. Finch, another inspector, who took Thatcher’s Assembly ticket, says that it was yellow, and that he did not notice whether it was thicker than usual or seemed to be pasted. Two yellow tickets, with Shook’s name ¡lasted on, were found in the Assembly box. (See .page 387.)
Although the evidence is circumstantial, yet the undersigned is satisfiéd that Thatcher voted for Shook, and this ballot should therefore be deducted.
Chester Sitterly and James Yan Wormer were soldiers in the army, and their ballots were cast in the third election district of the town of G-uilderland. (See page 399.) It was shown that they did not reside in that town. (See page 363.)
Heither of them voted the Assembly ticket. (See page 400.)
Theodore Honey removed from the first to the second election district of the town of Knox, two or three days before election. Fie voted the union ticket in the second district on election day. (See pages 372, 387, 397.)
He was clearly a legal voter. (See Constitution, art. 2, sec. 1.)
We have, then, the following summary:
Hungerford’s vote.... 2,761
.Deduct pauper vote. 12
Deduct pasters. 2
Deduct Yan Wagner’s vote. 1
Deduct Titus’ vote. 1
— 16
Remaining 2,745
*353 Shook’s vote...,..•... 2>732
Add written tickets .... ^.. .•...'. 6
Add pasters....,. 2
2,740
Deduct Artel’s vote.. 1
Deduct Thatcher’s. 1
— 2
.Remaining. 2,738
Leaving a majority of seven for Mr. Hungerford.
But a far more important question remains to be determined.
"Was the election in the western election district of the ninth ward void by reason of the riot and tumult which occurred there on election day ?
This was the part of the case to Vhich the attention of the committee was especially directed, and upon which the most of the evidence was given.
That an election may be declared void by either branch of the Legislature on account of the riot, disturbance or tumult attending the same, is well settled by the authorities.
“ Whenever the freedom of election is violated by any riot, disturbance, or tumult at the polls, by which the proceedings are actually interrupted; although the returning officer may not thereby be prevented from completing the poll, and making a return, the election will be void.
“A riot may proceed by actual force or violence, or by a display of numerical strength, accompanied with threats; and though no actual violence take place, yet, if the conduct of the parties engaged is of such a character as to strike terror into a man of ordinary firmness, and to deter him from proceeding to the poll, the election can hardly be said to be free.
“ It is necessary, also, to the existence of such a riot as will avoid an election, that it should be founded on system, or, at least, upon premeditation; for a casual affray, or an accidental disturbance, without any intention of overawing or intimidating the electors, cannot be considered as affecting the freedom of elections.
“ And when the proceedings at an election are interrupted by riots, the election will he held void, without reference to the number of votes thereby affected.” (Cushing’s Law and Practice of Legislative Assemblies, p. 68.)
*354 The right of every citizen to vote is guaranteed by our Constitution. (Art. 2, Sec. 1.) And that this right may be fully protected, it is provided by our laws as follows :
“ The board of inspectors shall possess full authority to maintain regularity and order, and to enforce obedience, to their lawful commands, during an election, and during the canvass and estimate of votes, after the closing of the poll; and shall have full authority to preserve peace and good order at and around the polls of-the election, and to keep the access thereto open and unobstructed; and may appoint one or more electors to communicate their orders and direc-rections, and to assist in the performance of their duties in this section enjoined.” (Rev. Stat., part 1, chap. 6, tit. 4, art. 3, sec. 32.)
The inspectors have likewise authority to deliver into the custody of the sheriff or any constable, whoever may disobey their commands, or conduct ip a disorderly manper. (Sec. 33.)
What are the facts in the case bofore us ? Was the election orderly in its character? Was it attended merely by a large number of politicians, active and ardent in their preferences, it maybe, but who confined themselves to legitimate and proper arguments to induce voters to support their respective candidates ? -
Was the only inconvenience, that usually resulting from a heated election, where many are seeking to exercise the privilege of the elective franchise? Or was there a deliberate, determined purpose, preconcerted or not is immaterial, to prevent persons of a particular party from voting for their candidates? Was this purpose carried into effect by means of threats, of intimidation, of wounds, of blows, and all the concomitants of a savage and brutal affray? Was this violence cloaked and sanctioned by assumed forms of law ? Let the evidence answer.
We cannot fail to conclude that riot, tumult and violence did prevail at this poll, so that the election, in no sense, can be considered free, but should be declared void.
In coming to this conclusion, it is not necessary to assume that any design to produce the result was manifested in having the democratic ticket of a peculiar color, or in the police arrangements.
But it must be confessed that the conduct of the board of inspectors was exceedingly reprehensible, and tended in a great degree to produce the painful consequences of the day. They began by selecting a body of special constables, all of one political persuasion, and ardent partisans, who assumed throughout the election to have *355 supreme and entire control over the polls, even to the exclusion of the police.
But one of these “ specials ” was placed on the stand, but his evidence was conclusive as to the nature of the service performéd by him, and the duties he thought himself required to fulfill. He was foremost in every deed of violence that transpired during the day, and evidently prided himself on the thoroughness of his exploits. When those who are commissioned to preserve order and to protect the rights.of every citizen to vote, are themselves the first to trample upon that right, the result can be easily predicted. It does not appear that the inspectors troubled themselves particularly about these proceedings outside, except that they now and then remonstrated with the more turbulent.
The polls were held in the same building with a drinking saloon which was kept open during the election. The voters came up to a window opening on the street, and handed their ballots to the inspectors who were inside.
Ninety-eight witnesses were called to speak of the proceedings at these polls. Over ninety concur in stating that a great deal of violence was used, and characterized it in terms more or less ‘emphatic. These witnesses comprise persons of the first respectability in the city, and of both political parties. Whether a concerted plan was formed in advance is immaterial. The testimony clearly shows that some concert of action existed between the chief rioters throughout the day. That these obstructions were not simply the result of a crowd is manifest from the discrimination shown towards the voters. Not ademocrat was prevented from casting his ballot, whiie thirty-nine attempted to vote union tickets but were unable. Thirty-two of these were registered, and the remaining seven were shown to be legal voters. Nine were cut in the limbs and eleven were struck. All of the persons thus injured were members of the union party. Only one democrat was wounded, and he but slightly. Whenever persons holding the union ticket were seen near the polls, the cry of “ open the polls ” would be raised, and the whole crowd swept out into the street. The inspector, Con-ners, manifested his partiality by repeatedly receiving democratic votes from persons standing further from the polls than those offering union ballots. When Mayor Perry arrived, about two o’clock in the afternoon, he made some slight efforts to restore order, and give an opportunity for all to vote. His own language and acts, in the opinion *356 of the undersigned, are strong proofs of the existence of a turbulent and riotous state of affairs, too great to allow of a fair election. These efforts were soon suspended, and the disorder continued till the polls closed.
Repeated threats and insults were addressed to prominent members ot the union party, and to others who were seeking to reach the polls for the purpose of depositing union ballots.
It is alleged that men connected with the union party were likewise guilty of breaches of the peace. The only evidence to sustain this allegation is that concerning Stackhouse, who drew a pistol and was arrested. The proofs show that Stackhouse did not draw his pistol till he had .been himself attacked, and that afterwards some one snapped a pistol aimed at his head.
Whether the state of things testified to as existing at these polls was sufficient to render the election void, is, of course, a question of fact, which each member of the Assembly is to decide for himself.
The undersigned is fully convinced that under the authorities already quoted, such was the case. It is conceded that no direct precedent exists for this procedure in our own State, but the general principles applicable to the election laws, the decisions of other States and above all our own sense of right can easily determine the question for ns.
' .Judge Willard, in the ease of the People against Cook (é Seld., page 69), speaks as follows: ’
“ I do not intend to assert that there may not be departures from the statutory requirement with respect to the time of opening and closing the polls, and with respect to some otter matters which would put in hazard the whole vote of the district.
“ It is probably impracticable to prescribe a rule which will enable us to determine, in all cases, what irregularities of the inspectors will vitiate an election. It may be safely affirmed, that if the irregularity does not deprive a legal voter of his right, or admit a disqualified person to vote; if it casts no uncertainty on the result, and has not been occasioned by the agency of a party seeking to derive a benefit from it, it may be overlooked. There is nothing in the principle which holds out the slightest imitation to disorder at the polls. Should a gang of rowdies gain possession of the ballot-box, during or after the close of an election, before the canvass, and destroy the whole or portions of the ballots, or introduce others' surreptitiously into the box, so as to render it impossible to ascertain the number of *357 genuine ballots, the whole should be rejected.” (People against Cook, 4 Seld., page 93.)
But it is urged that if this poll be declared void, the vote of the whole Assembly district should be thrown out, and a new election ordered. This course has been adopted in nearly all the cases given in the books, but the circumstances of these cases differ materially from the one under consideration. There the candidates were chosen from one election district alone. Clearly, if the election in that district was void, a new election must be ordered. Here a large number of districts united in the election of the same member of Assembly, and it would be in the highest degree unjust to the remaining districts whére the election was conducted in a quiet and orderly manner to disfranchise them for the misconduct at one of these districts. "What then shall be the effect of this disturbance upon the vote cast at this poll ? Two courses are open.
Mr. Parrott testifies (page 26) that lie returned with the eight soldiers’ votes to which reference has already been made, and the proper affidavits for all of them. By reason of the crowd he was pre-^ vented from reaching the polls and depositing such votes. Now, it has been well settled that when a legal voter has been prevented from voting, evidence-cannot afterwards be received as to the manner in which such a person would have cast his ballot if he had been permitted to vote. (In re L. J. B. B. Com. 19, "Wend. 37, Hartt v. Harvey, 32 Barb. 55.)
W"e cannot, therefore, say that because thirty-nine persons swore that they would have voted for Mr. Shook had they not been prevented, therefore these votes should now be counted for him. The law in all cases presumes a locus penitentiae till the ballot is actually cast. But does the rule of law and the reason of it apply to the case of the eight soldiers’ votes held by Mr. Parrott ? The undersigned thinks not, and for the following reasons:
This act of voting, under the law of 1864, was fully completed, so .far as the soldier was concerned, in the camp. He had expressed his choice, and the ballot had passed from his control. The law provided a way by which that voter’s ballots should reach the polls, but no change of intention could alter this vote as far as the particular ballot was concerned. No locus penitentiae here existed. No doubt of the voter’s intention can be found. All that has been settled, and the mechanical act of depositing the ballot in a particular box only remains.
*358 It may be urged in reply that the soldier might have returned home on or before election day — that he might send other ballots. But these reasons would have applied with equal force to have, excluded every soldier’s vote which was cast. The point is a novel one, but to the undersigned it seems clear that as the reason of the old rules of law here fails; the rule itself must fail also.
Eight votes for Shook were then excluded by this display of force, ' which we can properly count for him under this view of the case, and which would elect him by one majority.
The undersigned, however, goes further, and holds that the entire vote of this district should be rejected.
To determine what amount of riot and tumult shall invalidate an election, we are not obliged to resort to extreme cases as guides. A man is not compelled to endanger his life, or to incur risk of bodily injury before he shall forbear his efforts to vote.
An orderly, quiet election is the right of every one, and the inspectors do not want for powers to assert such right. If they fail of discharging this duty through willful or casual neglect, the consequences must rest upon the people of the district. Such a display of violence as to deter men of ordinary firmness from proceeding to the polls, and not merely casual in its nature, will be abundantly sufficient to warrant the supreme legislative power in declaring all the proceedings had at that poll void. That such a state of affairs existed at these polls throughout the greater part of the day no one can doubt.
It is a harsh remedy to apply, but this remedy is the only one which will strike at the root of the evil. It is only in the last resort that any portion of the community should be disfranchised, but when that community have actively or tacitly aided in disfranchising a portion of their own citizens, the punishment should follow".
By a long and bloody war we have sought to maintain the right of every citizen freely to express his opinion at the ballot-box, and to enforce the doctrine that the will of the majority, properly expressed, shall be the law of the land. Surely at this crisis, above all others, it is unbefitting for us to sanction those evils, similar in character, and differing only in degree, which we have sought to blot out, even at the cost of treasure and life.
Such crimes against society, when unrebuked, become contagious, and sooner or later undermine the fairest and the firmest structures of government.
The result of the election would then be as follows :
*359 Hungerford s vote. C0 cS
Deduct vote of this poll CO
2,326
From this take paupers’ vote . ... [ t-H
From this take Tan Wagner’s vote t-i
13
Balance.'.. 2,313
Shook s whole vote to CO to
Deduct vote of this poll i — 1 CD
2,583
From this take Artel’s vote rH
And Thatcher’s vote. tH
2
2,581
Thus electing Mr. Shook by a majority of 268.
The undersigned therefore recommends the adoption of the following resolution:
Resolved, That Joseph Shook was, at the last general election, duly elected a member of this body from the second Assembly district of the county of Albany, and that he is entitled to the seat now held by Oliver M. Hungerford.
[Respectfully submitted.
W. H. GLEASON.
April 6th, 1865.
(See testimony accompanying said reports, pages 1 to 403.)
Assembly Documents, 1865, No. 132; Assembly Journal, 1865, page 1115.
[Report of Minority of Committee.
Assembly Chamber, April 8th, 1865.
Mr. Veeder, from a minority of the committee on privileges and elections, to which was referred the petition of Joseph Shook, that he may be awarded the seat now occupied by Hon. O. M. Hunger-ford, reported in writing, adversely thereto:
*360 In Assembly, April 8, I860.
REPORT OF THE MINORITY OF THE COMMITTEE ON PRIVILEGES AND Elections, on the Contested Seat in the Second Assembly District of Albany County.

To the Assenibh/ of the State of New Yorh:

The undersigned, a minority of the committee on privileges and. elections, to which was referred the petition of Mr. Joseph Shoolc, claiming the seat now held by Mr. O. M. Hungerford, respectfully report:
That a large portion of the time of this committee, during the present session, has been spent in taking testimony and hearing the arguments thereon, in this'case; but the undersigned deem it necessary only to state enough to present the leading features of the controversy, and such parts as shall enable the Assembly to decide justly on points on which the members of this committee are divided in opinion.
The total vote given for Mr Hungerford, as appears from the returns, was.■.2 >761
For Mr. Shook. 2,732
Making a/ majority for Mr. Hungerford of. 29 votes.
It is claimed, on the part of the contestant, that certain illegal votes were given for Mr. Hungerford which ought to be deducted, but all the votes claimed to be illegal, which were actually cast for Mr. Hungerford; if deducted, would not overcome the majority of twenty-nine above stated.
We purpose briefly to state the claims made, and our conclusions upon the 'evidence.
It is alleged on the part of the contestant, that twelve inmates of the alms-house voted in the western district of the tenth ward, who liad not, before they were sent to the alms-house, a residence in that election district.
As to ten of these, there is no necessity for a critical examination, because these being deducted, can in no respect affect the result. We purpose, therefore, without discussing either the question of fact as to how they voted, or the questions of law involved, to concede -a deduction of ten votes from'the aggregate vote of Mr. Hungerford.
But as to two others of the alleged paupers, viz.: John Fitzgerald and Roger Kelly (page 193 of the testimony) no deduction should be *361 made, because the evidence shows .that they were employed, the former as a nurse in the hospital, and the latter as a keeper of the stock, and they were not, therefore, supported at the public expense.
By the express terms of the statute (1R. S., 5th ed., 431), it is only when a person is “ maintained in an alms-house, hospital or asylum, at the public expense,” but he fails to gain a residence by becoming an inmate.
The next claim by the contestant, that at the canvass of the votes for Assembly in the western district of the ninth ward there were six' tickets on which Mr. Shook’s name was written, and Mr. Hunger-ford’s printed. It appears that the writing was by no means plainly legible, nor was there any satisfactory evidence of a design to erase the printed name, and that it was proposed by Mr. Strempel, the republican member of the board of inspectors, that these six votes should not be counted for either candidate, and that this suggestion was adopted.
It is now proposed, without the presence of these votes, and with much less opportunity for ascertaining the intention of these voters, to count these nine votes for Mr. Shook.
The undersigned cannot acquiesce in the justice of this proposition ; but as it is a matter that might lead to extended discussion, and can in no way affect the result, they propose to concede these six votes to Mr. Shook.
It is next claimed on the part of the contestant, that in the canvassing the Assembly votes in the northern district of the ninth ward, two printed pasters with the name of Mr. Shook on them were found loose in two tickets on which Mr. Hungerford’s name was printed, and that these two votes, which were counted for Mr. Hungerford, should be deducted from the aggregate vote of Mr. Hungerford- and added to the vote of Mr. Shook, thus making four votes difference in the result. The undersigned cannot concur in the allowance oí such a claim. There is no evidence whatever that the pasters had ever been affixed to the face of the printed ballots, nor that either the ballots or the pasters indicated by their appearance that they had been so affixed. Certainly the paster alone was not a legal ballot within the requirements of the statute, and it can gain nothing by being placed, either accidentally or otherwise, within a legal ballot unless affixed to the ballot, and covering the name printed pn the ballot. It certainly indicates no intention on the. part of the voter to. alter- the ballot. The undersigned cannot therefore concur in the justice of this claim. x
*362 "Willis Yan Wagner voted for Mr. Hungerford in the eastern district of the ninth ward, and it is charged by the contestant that he was, at the time, and had been for several days previous, a resident of Schoharie. This claim seems, to the undersigned, to be so plainly wrong that they would fail of their duty if they did not show its fallacy. The contestant relies mainly on proof made by Mr. Peter Foland, that on the 24th of October, Yan Wagner, who had been boarding at his house in the eastern district of the ninth ward, left his house for Schoharie, and told him “he had hired out to his uncle to clerk it in the bank there” (page 165); but, on his cross-examination, the witness made a- statement materially different as to what Yan Wagner said on leaving (page 167). That he left town about two weeks before the election, was also proved by Mr. Weidman, and was not controverted. But the question was, when he ceased to be resident of Albany and become a resident of Schoharie ? To this point Mr. Yan Wagner himself testified (pages 365, 366) that he had resided in Albany more than a year before the last election, and resided there on the last election day.
That he went to Schoharie, before the election, on a visit to attend the fair, and had remained there, at the suggestion of his uncle, Judge Goodyear; in the hope of obtaining the place of cashier in the bank of his uncle, in case Judge Goodyear’s son, who then occupied that position, should conclude to accept an offer to go into business in the city of New York.
That he was not employed to remain in Schoharie until after the election and on the eleventh of November, and that on the morning of the day of the election, as he was starting to come to Albany, he applied to his uncle to inform him whether he could give him the place and his uncle told him he had not decided and did not know whether he should want his services or not, but would ascertain in a few days (page 366). Mr. Yan Wagner testified that he did not form the intention of becoming a resident of Schoharie until after the election; that when he went to Schoharie, before the election, he'left clothing and his washing at Foland’s, and books and accounts at Weidman’s store in Albany, and that he settled for his washing as usual when he came to Albany on election day; that he received nothing for-any services rendered in Schoharie before the election.
It further appeared that Mr. Yan Wagner did not vote at the town meeting at Schoharie this spring, because he had not been a resident there four months, though it would have been four months if his resi *363 dence bad begun there at the time he went there before the election. (Page 371.)
In the opinion of the undersigned Mr. Yan Wagner was as clearly-entitled to vote in the district where he voted as any other resident in that district, and for authority, on this point the undersigned beg leave to refer to the report made to the Senate, in the Low and Niven case, by Mr. Folger, at page 54, where he says:
“ The true conclusion from a consideration of all the cases would seem to be that the residence or inhabitancy which will qualify a person to vote, is a present, settled, fixed abode, with no intent entertained to change the same until a fixed time then in the future. That not only must there be intent to give up or to take up a residence, but there must be action towards it. The mental determination, and the bodily execution of the decision of the mind, must both concur; and further, that there can be but one residence at a time; one residence cannot be acquired until a former residence is lost, nor can one be lost until another is acquired. (2 Kent’s Com., 574,10th ed., note E; Crawford v. Wilson, 4 Barbour, 504, 518.)
“ For himself, the undersigned (said Mr. Folger), in this investigation, has been disposed to look especially for the intent as the chief solvent of a conflicting or a doubtful array of facts, and in looking at the intent to rely more upon the testimony of the voter himself when that could be obtained, and when the voter seemed a fair and candid witness, than upon, any other evidence in the case.”
John Titus, who also voted in the eastern district of the ninth ward for Mr. ITungerford, is objected to as not then residing in that ward, and it is claimed by the contestant that his vote should be deducted. But in the opinion of the undersigned, the evidence (page 210) brings him clearly within the rule stated, by Senator Folger, and his' vote was legally cast.
Two others, Thomas B. Laraway and Charles Lewis, are also objected to by the contestant, but on pretenses so entirely frivolous* that all the committee agree that the objection is unfounded.
This is the extent of all the deductions that it is claimed on the part of the contestant ought to be made from the votes actually given for Mr. Hungerford.
The undersigned find from the evidence that five illegal votes were given for Mr. Shpolc which ought to be deducted, as follows:
Joseph Arties voted in the western district of the tenth ward, and he testified that he was not at the time a resident of that district.
*364 Stephen W. Thatcher voted in the second election district, of the town of Knox, who was at that time a minojg. As to these two voters, Arties and Thatcher, the undersigned understand that all the committee agree that these votes should be deducted.
Jacob Sterling voted also in the second district of Knox, who is proved to have been at the time a resident of the town of Guilder-land. (See pages 393, 394.)
Morgan L. Schemerhorn voted in the middle district of the ninth ward of the city of Albany, and the evidence proves that he was at that time a resident of the eastern district of that ward, or of the city of Washington; at all events, the proof is clear that he did not reside in the district in which he voted, and had never resided there. (See pages 374, 377, 401, 402.)
Ephraim Lasure voted in the eastern district of the ninth ward, when it was plainly established that he was at the time a resident oí North Adams, in the State of Massachusetts. (Seepages 610, 377, 378, 379, 380.)
Of the votes therefore actually cast, if you deduct from those certified for Mr. Hungerford. 2>761
The alms-house votes. 10
He will still have. 2 >751
And if you add to the votes certified for Mr. Shook. 2 > 732
The six written votes.:. , 6
Mr. Shook will have. 2>738
And then deduct the five illegal votes above stated. 5
He will have. CO cq
Which deducted from the votes of Mr. Hungerford 1C cq
Leaves still a majority for Mr. Hungerford of.'. 18
It is further claimed on the part of the contestant that some soldiers’ votes ought to be allowed as if cast in the western district of the ninth ward.
It is shown that James Parrott came to the polls, and after voting himself, offered two soldiers’ votes, which were received; that he then offered the vote of another soldier who was not registered, and objection being made he retired to procure the necessary affidavits of residence. Parrott had in his possession at the time seven more soldier’s *365 votes that he intended to offer in addition to the one objected to, eight in all, he afterward procured the affidavits of residence, but did not "again offer to the inspectors the vote that had been objected to, nor did he, at any time, offer to the inspectors the other seven soldiers’ votes.
Now, upon what pretense is it that votes not even offered to the board of inspectors can be counted and canvassed, the undersigned do not comprehend.
No rule is better settled than that no votes can be counted unless they have actually been received and put in the ballot-box.
In the contested election of Low and Niven that rule was rigidly enforced, and the Senate committee refused to allow legal votes which had been improperly rejected by the inspectors, though they had been offered to the inspectors, and had been actually placed in their hands.
Senator Folger said on page 37 of his report: “ The actual result of an election must be declared from a counting of the votes actually received. The right of any tribunal to review the determination of the boards of canvassers, and to adjudge that the person found elected by these boards was not in fact elected, and that instead of him another person was really elected, must be confined to adjudging this upon the votes actually received into the ballot-box.”
“ But it would be too vagabond and unsafe a power for a tribunal of review to exercise, to inquire for whom the electors would have voted in case their ballots had reached th'e boxes. The power of changing their votes remains with them until it has passed into the box, and we cannot assume that such power would not, in some cases, be exercised.”
And he proceeds to show why, in England, a vote tendered may be counted. It is because the vote there is viva voce, and a tender of his vote is, of course, an announcement of it. Mr. Folger further says, on page 38: “ That the vote by ballot does not declare his choice until the ballot has passed from his control and has gone into the ballot-boxand lie refers to different authorities in support of his his opinion.
It was agreed by the counsel for the contestant that this view was not applicable to soldiers’ votes, and it was said that the soldier had exhausted all his control over his ballot when it left his hands.
But this argument is plainly erroneous. The soldier has the legal right to stop and to supersede by a new power of attorney the vote he has prepared after it has left his hands. He may appear personally *366 at the polls and exercise the right of casting a personal vote in preference to his previously prepared printed vote, if he chooses to do so.
His right to control does not ceasfe till his ballot is placed in'the ballot-box.
. Indeed, the person holding the soldier’s ballot, and presenting it to the board of inspectors, is only the agent of the soldier, and all his acts are, in law, but the acts of the soldier himself.
If soldiers’ votes, duly prepared, but not offered at the late election, may now be counted, it is thought many hundreds, and perhaps thousands, will appear as candidates for allowance on the proposed new canvassing with quite as good a claim as that now made in behalf of these eight votes.
One other question remains to be considered by the undersigned.
It is alleged by the contestant that the poll of the northern district of the ninth ward of the city of Albany was blocked on the afternoon of the day of election, so that the republican voters had great difficulty in getting up to the poll, and in some instances were unable to do so. Many witnesses have been examined to this point on both sides, and the evidence is, in some respects, contradictory.
That the poll was at no time of the day actually blocked is evident from the well-established fact that votes were received during the entire day, 'without intermission. The inspectors were constantly engaged in taking the votes, and there was no delays except the little which was incident to disposing of challenges and searching the registry for the names of voters. About six hundred votes were taken during the day, and this was an average of about a vote for. every minute of time the poll was open.
That there was a great number of .persons there pressing to get up to vote, and that there was great difficulty in getting up through the crowd to the poll, there is no doubt; and it is eqtially certain that there was difficulty in getting out through the crowd after voting; with so great a pressure around the poll, and with the excitement attendant upon such an election, it could hardly have been otherwise. But a fair examination of the testimony negatives entirely the idea that there was any predetermination to prevent a fair vote, or any concerted action at the poll to deprive republican voters of the same rights enjoyed by those who vbted the democratic ticket. The adverse testimony on this point is fully met and rebutted by the positive testimony of those .who could not have failed to know it, if any such combination had existed. There was no riot and but little personal vio *367 lence, less than usually occurs on sucb an occasiou among so large an assemblage, and in so heated a canvass.
The undersigned regard the proposition made to set aside the election of that particular district, so as to deduct the majority there given for Hungerford, and thus elect Shoot, as entirely unwarranted in law, and.an arbitrary exercise of power never before attempted in a legislative body. As a precedent, it could not fail to be exceedingly dangerous, and it would go far to weaken the confidence of the people in the justice of their representatives. It would be a disfranchisement of the electors of that district, because it would deprive them of the opportunity of voting at a new election.
If a case occurs of fraud or violence of such an extreme character as to warrant the setting aside of an election, the only fair course is to remit the whole matter again to the judgment of the people. To select out a particular district, and to set aside an election in that district alone, or rather arbitrarily to reject all the votes of that district, and thus elect a favorite candidate is a usurpation of power not delegated, and a defiance of the popular will. It would be an election by the Assembly and not by the people.
Protesting, therefore, against the legality and justice of the proposed action, the undersigned dissent from the conclusion of the majority of the committee, and recommended that a resolution be adopted declaring that Oliver M. Hungerford was duly elected a member of this house, and rightfully holds his seat here.
All of which is respectfully submitted.
JESSE F. BOOKSTAVER,
WILLIAM D. VEEDER,

Committee.

Assembly Documents, 1865, volume 9, No. 186; Assembly Journal, 1865, page 1164.
Reports made Speoial Order.
IN Assembly, April 11th, 1865.
Mr. Gleason called for the consideration previously reported by the committee on privileges and elections relative to the petition of Joseph Shook, praying that he -may be awarded the seat now occupied by Hon. O. M. Hungerford. ******
Mr. Wood moved to make the consideration of said resolutions a' special order for to-morrow evening at 7i o’clock.
*368 Mr. Speaker put the question whether the House would agree to said motion, and it was determined in the affirmative, two-thirds oí all the members present voting in favor thereof.
Assembly Journal, 1865, page 1243.
Seat awaeded to Joseph Shook.
Assembly Chambee, April 12th, 1865.
Mr. Angel called for the consideration of the resolutions reported by the committee on privileges and elections in relation to the contested seat now held by Hon. Oliver M. Hungerford, in the words following, to wit:
Resolved, That the election held in the western district of the ninth ward of the city of Albany, on the 8th day of Hovember last, is hereby declared void, in consequence of the freedom thereof being interfered with by violence, to such an extent as to disfranchise a large proportion of the electors residing in said district.
Resolved, That Joseph Shook by the greatest number of legal votes cast, was duly elected a member of Assembly, from the second district of Albany county, on the 8th day of Hovember last, and is entitled to the seat now occupied by the Hon. O. M. Hungerford.
Debate was had thereon, when Mr. Kedington moved the previous question.
Mr. Speaker put the question “ Shall the main question be now put,” and it was determined in the affirmative.
Ayes, 49. Hoes, 39.
Mr. Speaker put the question whether the House would agree to said resolution, and it was determined in the affirmative.
Ayes, 59. Hoes, 39.
Assembly Journal, 1865, page 1272.
Joseph Shook swoen in.
Assembly Chambee, April 18th, 1865.
Hon. Joseph Shook to whom was awarded the right to the seat occupied in the past by Hon. O. M. Hungerford, appeared in the Assembly Chamber was sworn by the Speaker, and took his seat as a member from the second district of the county of Albany.
Assembly Journal, 1865, page 1271.